IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALGETERNAL TECHNOLOGIES, LLC, | § | |
| AND MILTON HUGHES MORRIS | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| David Ramjohn, Bruce Dopslauf, | § | CIVIL ACTION NO._____ |
| BK Cook Family, LP, | § | |
| Brian Cook, Arthur Day, M.D., | § | JURY DEMANDED |
| W.A. Sanford, 5X5, SBS Holdings, LP, | § | |
| Hochburg Holdings, LP, | § | |
| Donald Meiners, | § | |
| Anna Katherine Schmidt and Rob Eissler | § | |
| | § | |
| DEFENDANTS. | § | |

---

**PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY
RESTRAINING ORDER, TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION**

---

Plaintiffs AlgEternal Technologies, LLC and Milton Hugh Morris file this complaint

against Defendants David Ramjohn, Bruce Dopslauf, BK Cook Family Limited Partnership, Brian

Cook, Arthur Day, M.D., WA. Sanford 5x5 Trust, SBS Holdings, LP, Hochburg Holdings, L.P.,

Donald Meiners, Anna Katerine Schmidt, and Rob Eissler for patent infringement, declaratory

judgment, breach of fiduciary duty, breach of contract, defamation, and other related causes of

action.

## I.

### PARTIES

1.     Plaintiff AlgEtneral Technologies, LLC ("AlgEtneral"), is a Texas Limited

Liability Company with its principal place of business at 3241 Dubina-Weimar Road, Weimar,

Texas 78962.

2.      Plaintiff Milton Hughes Morris is a Texas individual who resides at 3241 Dubina-Weimar Road, Wiemar, Texas 78962.

3.      Defendant David Ramjohn is a foreign national who currently resides at 254 W. Milan St, La Grange, Texas 78945.

4.      Defendant Bruce Dopslauf is a Texas individual who resides at 5133 Mullins Prairie Loop, La Grange, Texas 78945.

5.      Defendant BK Cook Family, LP is a Texas limited partnership with its principal place of business at 2200 Arcady Lane, Corsicana, Texas 75110.

6.      Defendant Brian Cook is a Texas individual who resides at 2200 Arcady Lane, Corsicana, Texas 75110

7.      Defendant Arthur Day, MD is a Texas individual who resides at 2226 Quenby Street Houston, Texas 77005.

8.      Defendant W.A. Sandford 5X5 Trust is a Texas trust which can be served at 601 W. Main ST, Decatur, Texas 76234.

9.      Defendant SBS Holdings, LP, is a Texas limited partnership with its principal place of business at 601 W. Main ST, Decatur, Texas 76234.

10.     Defendant Hochburg Holdings Limited Partnership is a Florida limited partnership with its principal place of business at 317 Ocean Blvd. Golden Beach, Florida, 33160.

11.     Defendant Donald Meiners is a Texas individual that resides at 6326 Rocky Creek Road, La Grange, Texas 78945.

12.     Defendant Anna Katherine Schmidt is a Texas individual that resides at 352 E. Lower Line St. La Grange, Texas 78945.

13.     Defendant Rob Eissler is a Texas individual that resides at 431 Nursery Road, B-400, The Woodlands, TX 77380.

## II.

### NATURE OF ACTION

14.     This is a civil action for the willful infringement of United States Patent No. 9,534,197 B2 under 35 U.S.C. §1, *et. seq.*, for a declaratory judgment under 28 U.S.C. §2201 *et. seq.*, injunctive relief under Federal Rule of Civil Procedure 65, as well as various related Texas state law causes of action, including breach of contract, breach of fiduciary duty, defamation, and others.

## III.

### JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  It has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

16.     Defendants each have sufficient contacts with Texas generally and with the events underlying this claim, so that they are subject to the exercise of jurisdiction of this Court.

17.     Venue is proper in this Judicial District and Division because a substantial part of the events or omissions that gave rise to Plaintiffs' claims occurred in this Juridical District and Division.

## IV.

### THE PATENT

18.     On January 3, 2017 Patent Number 9,534,197 B2 was issued to Milton Hugh Morris (the "Patent").  Morris had previously assigned the pending patent to AlgEternal Technologies, LLC.  AlgEternal is the sole owner of the right to sue and to recover for any current or past infringement of the Patent.  A true and correct copy of the Patent is attached as Exhibit A.

## V.

### CONDITIONS PRECEDENT

19.     All conditions precedent to the Plaintiffs bringing this suit are satisfied or have occurred.

## VI.

### FACTUAL BACKGROUND

20.     Milton Hugh Morris developed an apparatus and process for growing specialized strains or algae for use in cosmetic products and soil amendments.  He obtained the Patent for the apparatus and process.

21.     Morris founded AlgEternal, Technologies, LLC ("AlgEternal") in 2010 to monetize the Patent by using the technology to grow the specialized strains of algae and produce cosmetic products and soil amendments with the algae.[1]

22.     Morris assigned the Patent to AlgEternal as part of his initial contribution to the company.  Morris also contributed all of the company's pre-formation development costs, which exceeded $200,000.

23.     Morris brought others into the company to help launch and manage the venture and provide start-up funding.  The initial members and their membership interest percentages consisted of Morris with 51%, Old Plum Road investments, LP (a company controlled by Bruce Dopslauf) with 5%, and Theodor McAlister with 10%. The company retained other units in treasury.  Over the years numerous new members have been admitted, other members transferred some of their interests, and Morris assigned approximately 9% of his interests to others.

---

[1] Exhibit B, AlgEternal Certificate of Formation, Company Agreement, and Initial Schedule of Ownership.

4

24.     No one besides Morris that is involved with the company has any scientific expertise in growing algae.  The other members' contributions were largely financial, except for Eissler, McAlister, and White, who assisted in the management and launch of the company.

25.     The company initially focused on developing its technology and finding markets for its products.  Evaluations by Texas A&M University proved the viability of its soil amendment products.  The company has lined up hundreds of thousands of dollars in orders for its cosmetic products, which sell for $80 per oz. that are made from sulfated polysaccharide valued at $300 per gram.

26.     The members of AlgEternal all agreed to a company agreement.  The company agreement vests the company's managers with the complete and exclusive right to conduct business on behalf of the company.[2]  The agreement permits the managers to hire officers and employees to act on behalf of the company, who serve at the pleasure of the managers.[3]

27.     AlgEternal has only ever had two managers—Morris and McAlister.  Morris and McAlister have been listed with the Secretary of State as the company's only two managers since the company's formation.[4]

28.     The company agreement allows the managers, and only the managers, to appoint new managers by a majority vote.[5]  But they must do so at a formal meeting of managers or by a formal, written resolution.[6]

29.     At a few points in time, Morris and McAlister considered appointing Dopslauf, Eissler, and White as additional managers, but never did so.[7]  A few company documents contain

---

[2]     Ex. B.
[3]     *Id.*
[4]     *Id.*
[5]     *Id.*
[6]     *Id.*
[7]     *Id.*; Exhibit C, Affidavit of Theodore McAlister.

signature blocks that list Dopslauf, Eissler, and White as additional managers.[8]  But due to those persons' lack of interest in participating in the business, Morris and McAlister ultimately decided not to appoint them as managers.[9]

30.     No meeting of managers has ever been convened, and no written resolution has been drafted or signed, to appoint additional managers, and the company's certificate of formation has never been changed to reflect the appointment of additional managers.[10]

31.     In late 2015, Morris began suffering from serious health issues leading to congestive heart failure.  Fearing for the business, he decided to hire a new CEO to take over some of the company's management.

32.     Morris met David Ramjohn at an industry event.  Mr. Ramjohn was a citizen of Trinidad and Tobago who claimed to have experience in the algae industry.  Ramjohn boasted an impressive resume, but in reality, he had been a disaster in the private sector.

33.     Based on a litany of fraudulent misrepresentations by Ramjohn, Morris recommended to the managers and members that the company hire Ramjohn as a CEO.  Ramjohn has never been given any ownership in the company or been appointed as a manager.

34.     Morris later discovered that the company could not hire Ramjohn as a CEO due to US immigration law, and Ramjohn agreed to instead be formally hired as a paid consultant.[11]

35.     The managers' relationship with Ramjohn quickly soured.  Ramjohn had held himself out as a CEO knowledgeable in proper corporate management and stewardship.  Based on his credentials, the managers believed him.

---

[8]    *Id.*
[9]    *Id.*
[10]   Ex. B; Ex. C.
[11]   Exhibit D, Ramjohn Consultancy Agreement.

36.     Ramjohn presented the managers with a consultancy agreement that he claimed was standard and appropriate.  But the agreement was not standard nor appropriate.  It contained a clause that obligated the company to pay all Ramjohn and his families' personal living expenses, including housing and "wardrobe" expenses, which is highly unusual in a corporate setting.[12]  The managers did not appreciate that Ramjohn would take advantage of the company in the way he did, and signed the agreement on the assumption that Ramjohn would behave in a professional manner.

37.     Ramjohn did not behave in a professional manner.  As soon as he got access to company accounts he began charging the company for a host of personal expenses, including expensive clothing, lodging expenses, and unauthorized travel.  All of these charges were in addition to his $10,000 a month salary, which was extremely high for an employee of a small start-up company in Fayette County that had not yet begun generating revenue.

38.     At the time Ramjohn was making these charges, the company was in dire financial straits.  Whether or not the charges were contractually allowed by Ramjohn's agreement with the company (and they probably were not due to their general unreasonableness) they were a breach of Mr. Ramjohn's fiduciary duties to the company given their overall unreasonableness and the company's precarious financial situation.

39.     On information and belief, Ramjohn also appears to have engaged in some outright embezzlement. He appears to have misdirected at least one company check to his personal accounts.

40.     Ramjohn was also a disaster on the business side.  He did not bring in any of the investment dollars he promised.  He did not develop any new business.  He was no help with the

---

[12]     *Id.*

scientific or technical aspects of the company.  He created unreasonable budgets that attempted to shift money away from the actual operations of the company (growing algae) in favor of useless administrative and corporate overhead, and could not stay within his own budgets.

41.     Because of these issues, Morris and McAlister moved to demote Ramjohn while they investigated his actions.  The managers informed Ramjohn that if he did not accept his demotion, he would be terminated. Ramjohn did not accept his demotion and was terminated.[13]

42.     Unbeknownst to Morris, as soon as Ramjohn was hired, he began working behind the managers' and majority owners' backs to attempt a hostile takeover of the company and to steal the Patent.

43.     Ramjohn began contacting the other minority members and spreading wild and defamatory lies about Morris.  Ramjohn told the members that Morris was embezzling money from the company and selling company products and keeping the money from the sales.

44.     These allegations were demonstrably false.  Morris has all the company bank records and credit card statements that show the only person embezzling money was Ramjohn. And the company was not even producing the product Ramjohn claims Morris sold for personal profit at the time Ramjohn claimed it was sold.

45.     Nevertheless, through his lies, Ramjohn managed to convince a minority group of investors that owned approximately 38% of the company that Morris was a bad actor (this minatory group is hereafter referred to as the "Signing Minority Members," and most of these members are Defendants in this lawsuit).

---

[13] Exhibit E, Ramjohn Termination Resolution.

46.     Ramjohn then had the Signing Minority Members sign a bizarre "resolution" that stated that Morris had committed, among other things "fraud," "theft," and "gross negligence" and had "willfully" violated the company agreement.[14]

47.     The resolution then claimed that because the Signing Minority Members constituted a "Super Majority" of members (they did not) they had the power to, and did, cause the forfeiture of all Morris' membership interest and the removal of Morris as a manager of the company.[15]   The resolution then went on to "elect" five new managers of the company.[16]

48.     This "resolution" was wrong on so many levels that is difficult to imagine how any rational person could think it was effective or complied with the company agreement.   First, the company agreement allows a "Super Majority' of the members to remove a fellow member from the company.[17]   The company agreement defines "Super Majority" as "one or more members having among them more than 80% of the Percentage Interests of all Members."[18]   The resolution claims that Signing Minority Members constitute a "Super Majority" of members, but they only own among them approximately 38% of the "Percentage Interest of all Members."[19]

---

[14]     Exhibit F, Fraudulent "Resolution" and Cover Letter to Morris.
[15]     *Id.*
[16]     *Id.*
[17]     Ex. B.
[18]     *Id.*
[19]     Exhibit G, AlgEternal Current Schedule of Ownership and Unit Certificates.   Although it is difficult to imagine exactly what the Signing Minority Members are thinking, they may be trying to ignore the definition of "Super Majority" in the company agreement and craft a theory that because the expulsion provision, after it references the defined term, includes a parenthetical that states (not including the member to be expelled), "Super Majority" should somehow be calculated without including Morris' 42% Percentage Interest.   This would be wrong, because the company agreement clearly defines "Super Majority" as 80% of "all" members' Percentage Interests, not any subset of those members.   But it doesn't matter.   Even if Morris' interests are removed from the equation, the Signing Minority would only constitute approximately 41.5 out of 68.5 remaining units, far short of 80%.   The only other conceivable theory would be that Morris "pledged" 20 of his membership interests back to the company at a meeting in on May 31, 2017.   But this pledge was subsequently unanimously rejected by the managers of the company and rescinded by Morris.   And even if the pledge was effective, the 26 units held by the signing minority members would still only constitute 41.5 of 68.5 outstanding units, because these 20 units would not have disappeared, they would just be held in the company treasury, and the company, which acts through its managers, has not voted to exclude Morris. And finally, even if those 20 units could somehow be deemed to have disappeared, the minority members would still only represent 26 out of 58 remaining units.   Put simply, there is no calculation, no matter how creative, that gives the Signing minority members the 80% required by the company agreement.

49.     Second, the "resolution" claims to "elect" five new managers.[20]  But it is only signed by the Signing Minority Members, and not by either of the company's two managers—Morris and McAlister.[21]   And the company agreement very clearly only gives the company's managers, not the company's members, the authority to remove managers or appoint or elect new managers.[22]

50.     Finally, the "resolution" parrots boilerplate language from the company agreement and states Morris has committed "fraud," "theft," and "gross negligence" but contains no specific findings of any wrongdoing, and attaches no evidence of any wrongdoing.[23] And actual findings of wrongdoing are a prerequisite to expulsion under the company agreement.[24]

51.     The fraudulent "resolution" pursuant to the company agreement was therefore void *ab initio*.

52.     When each of the Signing Minority Members signed the resolution, they knew that the resolution would be circulated to all the members.

53.     They also knew that the resolution would be circulated in the business community in which Morris had worked for over a decade to establish a sterling reputation as well as the company's customers, suppliers and business partners.

54.     They also knew that the resolution, and its transmittal letter, contained statements that were highly defamatory of Morris, including statements that Morris had committed fraud,

---

[20]     Ex. F.
[21]     *Id.*  To the extent Defendants argue that Dopslauf, Eissler, and White were appointed managers, this would not change anything.  The company agreement only authorized the managers to act by majority vote.  Morris, McAlister, and White who would be the majority of managers if Dopslauf, White and Eissler had been appointed, did not sign or vote on any resolution to elect new managers.
[22]     Ex. B.
[23]     Ex. F.
[24]     Ex. B.

theft, and gross negligence.  These statements accused Morris of criminal wrongdoing as well as an inability to perform his business and dishonesty in business.

55.     Ramjohn and the Signing Minority Members then took the fraudulent resolution and used it in a campaign to infringe upon the Patent, smear Morris, and an attempt to take control of the company.

56.     They used the resolution to seize the company's bank accounts, which was only possible because one of the Signing Minority Members, Dopslauf, was the chairman of the company's bank.

57.     They also used their password access to lock Morris out of the company's accounting software, and circulated the resolution to the company's customers and suppliers and tried to convince them that Morris was not authorized to act on behalf of the company and that they controlled the company.

58.     They even attempted to send men to seize company property from Morris.

59.     Defendants have also used the fraudulent resolution to infringe on the Patent.

60.     Defendants have in their possession one of AlgEternal's algae growing apparatuses. They have made their position clear that they believe they control AlgEternal and the Patent, and, on information and belief, are actively attempting to use the apparatus to grow algae, produce products with the algae, and sell the products under the name of AlgEternal.

61.     These actions have caused immeasurable harm to the company at a time that the company was in a fragile state.  For example, the company is on the verge of fulfilling its first order for cosmetic cream, which could net the company upwards of $300,000.  But the seizure of the company's bank accounts is preventing the company from fulfilling the order, and will likely cause the company to lose its most valuable customer. The immediate near-term harm of Defendants' actions, without a doubt, already exceed five million dollars in near-term lost revenue.

62.     The actions have put the company's bright future in serious peril.  Ramjohn, with approval of many of the Signing Minority Members, had previously valued the company's future revenues at tens of millions of dollars.

63.     Defendants actions have put all of those revenues at risk, and should the company fail, Plaintiffs will seek damages based on the company's expected future performance.

## VII.

### APPLICATION FOR TEMPORARY RESTRAINING ORDER,

### TEMPORARY INJUNCTION, AND PERMANENT INJUNCTION

64.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

65.     As detailed above, Defendants are unlawfully seeking conduct business on behalf of AlgEternal, infringing the Patent, and are interfering with AlgEternal's managers' rights and duties to manage the company.  Defendants interference includes, but is not limited to, infringing on the Patent, representing to the company's customers, suppliers, bankers, employees, members, and other business partners that they are the duly elected managers of the company and that the actual managers of the company have no authority to act on behalf of the company.  Defendants have prevented the company's managers from accessing company funds and the company's books and records.  Defendants are currently attempting to seize company property to which they have no possessory right.

66.     A temporary restraining order and injunction is required to maintain the status quo because the last peaceable status between the parties was that the duly appointed managers of the company—Morris and McAlister, conducted the company's affairs and controlled and managed the Patent and all company property.  In addition, the last peaceable position of the parties was the position in which Morris was a member and manager of the company before Defendants issued

12

their bizarre, ineffective, fraudulent, and void *ab initio* "resolution."  Defendants' hostile takeover attempt has prevented the company from operating and threatens the company's survival.

67.     Plaintiffs have pled for permanent relief as evidence by this Petition.

68.     Plaintiffs have a probable right to relief on the merits because, among other reasons, AlgEternal's company agreement and related documentation is clear regarding who the managers and members of the company are, and what actions and votes are required to change the management or membership of the company.  Defendants "resolution" does not comply with the company agreement, as detailed above and this thus void *ab initio*.

69.     Plaintiffs have no adequate remedy at law because Defendants Patent infringement and illegal interference with their ability to manage AlgEternal will harm the company in such a wide-ranging manner that it will create damages that will be difficult to calculate as well as enormous.  None of the Defendants will be able to satisfy a money judgment that adequately compensates AlgEternal or its members for the harm that will be created if Defendants are permitted to destroy the company with their illegal hostile takeover attempt.  Further, AlgEternal's intellectual property is unique, and Defendants are expressly threatening to infringe on Morris's assigned patents by taking control of AlgEternal's patented technology.

70.     The balance of equities strongly favors an injunction.  On the one hand, Defendants' actions, described above, will destroy the company if they are allowed to continue.  On the other hand, there will be no harm to Defendants if they are ordered to comply with the company agreement and stop interfering with the proper management of the company.  As members in the company, Defendants only stand to benefit from the company's survival and success.

71.     Plaintiffs therefore request that the Court enter a temporary restraining order, temporary injunction, and permanent injunction under Federal Rule of Civil Procedure 65 prohibiting all Defendants and any person acting on their behalf, including any persons

Defendants' claim to have elected as managers or hired as employees, attorneys, or agents, of AlgEternal, from:

      a.  Infringing on the Patent by using any of AlgEternal's patented technology to grow algae or produce products from algae grown using AlgEternal's patented technology;

      b.  Acting on behalf AlgEternal or representing AlgEternal in any way;

      c.  Representing to any person that they have authority to act on behalf of or conduct business in the name of AlgEternal;

      d.  Representing to any person that the duly elected managers of AlgEternal, who are Hugh Morris and Theodore McAlister, and no one else, do not have authority to act on behalf of AlgEternal.

      e.  Interfering in any way with the duly elected managers of AlgEternal, who are Hugh Morris and Theodore McAlister, and no one else, from managing the affairs of AlgEternal;

      f.  Exercising any dominion or control over any AlgEternal company property, including but not limited to AgEtneral's company vehicles, equipment, money, bank accounts, website, or accounting software;

      g.  Interfering with AlgEternal's access to any of its bank accounts or funds,

      h.  Interfering with AlgEternal's access to its accounting software or any other company books or records;

      i.  Making any false or defamatory statements to any person about any manager or member of AlgEternal; and

      j.  Destroying any emails or documents that relate to AlgEternal.

72.     By the filing of this application for temporary restraining order and temporary injunction, and permanent injunction, Plaintiffs will notify Defendants of the hearing that will be held thereon.

73.     Plaintiffs are willing to post a bond for the temporary restraining order and temporary injunction requested herein.

## VIII.

### CAUSES OF ACTION

### A.

### INFRINGEMENT OF THE PATENT

74.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

75.     As detailed above, Defendants have infringed upon the Patent literally and/or under the doctrine of equivalents, by using AlgEternal's patented technology to grow specialized strains of algae and make products from that algae for sale and/or offering to third parties to do so without authority and in violation of 35 U.S.C. § 271(a), (b), and (c).

76.     Defendants do not have any license or authority from AlgEternal or any other person to use the Patent.

77.     The notice provisions of 35 U.S.C. § 287(a) do not apply because AlgEternal has not sold or offered to sell its patented technology to the general public.  To the extent Section 287 does apply, Defendants have been given effective written notice that their actions violate the patents in the form of communications from the duly elected management of AlgEternal that their actions violate the Patent and Defendants continue to willfully violate the Patent.

78.     Upon information and belief, Defendants continue to willfully infringe on the Patent.  Defendants' willful infringement of the Patent renders this an exceptional case pursuant to 35 U.S.C. § 285.

15

79.     Because of Defendants' infringement of the Patent, Plaintiffs have suffered damages and will continue to suffer damages in the future.

**B.**

**DECLARATORY JUDGMENT**

80.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

81.     As described above, Plaintiffs and Defendants have an actual controversy regarding who has the authority to act on behalf of AlgEternal and use the Patent.  Plaintiffs thus request a declaratory judgment pursuant to 28 U.S.C. § 2201 that:

a.   The proper duly elected managers of AlgEternal are Milton Hugh Morris and Theodor McAlister, and no one else;

b.   Defendants do not have the authority to act on behalf of AlgEternal or use the Patent; and

c.   The August 15, 2017 purported resolution signed by Defendants attempting to expel Milton Hugh Morris as a Member of AlgEternal and elect new managers of AlgEternal does not comply with the AlgEternal company agreement and has no force or effect.

**C.**

**BREACH OF CONTRACT**

82.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

83.     Each Defendant agreed to the AlgEternal company agreement.

84.     Each Defendant breached that agreement by all of the actions described above, including, but not limited to, breaching the agreement by interfering with AlgEternal's managers management of the company, and by signing a resolution that violated the company agreement in numerous ways.

85.     Defendants' actions damaged Plaintiffs by harming the company in wide-ranging ways, as described above, including the loss of near term revenue, productivity, and future business.

86.     Plaintiffs seek their actual damages as well as their attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## D.

### BREACH OF FIDUCIARY DUTY

87.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

88.     Ramjohn owed AlgEtneral and its members fiduciary duties as an officer of the company.  Those fiduciary duties included the duties of loyalty, honesty, good faith, care, and disclosure.  Ramjohn violated those duties by all of the actions described above, including but not limited to putting his own interests ahead of the company, committing all the acts of dishonesty described above, charging the company for unreasonable and improper personal expenses, embezzling money, negligently discharging his duties and an officer, participating in the improper hostile takeover attempt, interfering with the company's duly elected management, intentionally harming the company's relationship with its customers, suppliers, and business partners, and defaming Morris, the company, and its members.

89.     All Defendants owned the AlgEternal and its members fiduciary duties to the extent they exercised control over the company.  All Defendants have exercised control over the company by participating in their fraudulent hostile takeover attempt which included seizing the company's bank accounts and assets.  Further, to the extent Dopslauf and Eissler were ever properly appointed as managers (which they were not), they owed fiduciary duties as managers.  Eissler also owed fiduciary duties as an officer of the company.  Defendants violated their duties by all of the actions described above, including but not limited to participating in the fraudulent takeover attempt,

putting their interests ahead of the company's and the other members, interfering with the company's duly elected management, intentionally harming the company's relationship with its customers, suppliers, and business partners, and defaming Morris, the company, and its members.

90.     Defendants' actions damaged Plaintiffs by inflicting wide-ranging harm on AlgEternal, as detailed above.

91.     Plaintiffs' seek actual and punitive damages for Defendants' breaches of their fiduciary duties.

92.     Upon a finding that Defendants breached their fiduciary duties, Plaintiffs seek the equitable remedy of disgorgement.

## E.

### DEFAMATION, LIBEL, SLANDER, DEFAMATION *PER SE*, LIBEL *PER SE*, SLANDER *PER SE*, AND BUSINESS DISPARAGEMENT

93.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

94.     All Defendants committed defamation, libel, slander, and business disparagement by the numerous acts described above, including but not limited to creating a document that stated that Morris committed fraud, theft, gross negligence and other bad acts and publishing that document to numerous people in the community including people that Morris did business with on a regular basis.  Various Defendants such as Ramjohn and Dopslauf also made numerous oral statements to members of the company and members of the community that Morris committed fraud, theft, gross negligence and other bad acts.  All of these statements constituted defamation, libel, and slander *per se* because they accused Morris of committing crimes, stated that Morris was unable to conduct his business, and accused Morris of dishonesty in his business dealings.

95.     These statements harmed Morris by seriously damaging his reputation in the general and business community.

96.     Morris seeks punitive as well as compensatory damages for his defamation related causes of action.

### F.

### CONSPIRACY

97.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

98.     All Defendants conspired with one and other, as detailed above, to engage in the fraudulent hostile takeover scheme that infringed on the Patent, breached various Defendants' fiduciary duties, and constituted defamation, theft, and conversion.  Each Defendant, as detailed above, committed unlawful, overt acts to advance the conspiracy, including signing the fraudulent "resolution," improperly exercising control over company assets, and making defamatory statements about the company's managers.

99.     Plaintiffs were damaged by Defendants' conspiracy because it caused wide ranging damages to the company, as detailed above.

100.    Plaintiffs seek actual and punitive damages for their conspiracy cause of action.

### G.

### THEFT LIABILITY ACT

101.    Defendants are liable to Plaintiffs under the Texas Theft Liability Act, Civ. Prac. & Rem. Code § 134.001, et. Seq.

102.    Defendants have unlawfully exercised dominion and control over property belonging to the company, including the theft and embezzlement of company funds, as described above, and the seizure of company bank accounts and property.

19

103.    As a result, Plaintiffs have suffered injury by being deprived of the use and value of their personal property.

104.    Plaintiffs seek the return of their property, plus actual damages for loss of use, including lost profits, and additional damages and attorneys' fees as permitted under Section 134.005 of the Civil Practice and Remedies Code.

## H.

### CONVERSION

105.    Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

106.    Defendants have unlawfully exercised dominion and control over property belonging to the company, including the theft and embezzlement of company funds, as described above, and the seizure of company bank accounts and other property.

107.    As a result, Plaintiffs have suffered injury by being deprived of the use and value of their personal property.

108.    Plaintiffs seek actual and punitive damages of Defendants' conversion.

## IX.

### DEMAND FOR JURY TRIAL

109.    Pursuent to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues triable by jury,

## X.

### PRAYER

110.    WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and that Plaintiffs be awarded a judgment against Defendants for the following:

      a.   actual damages plus interest;

     b.  the declaratory judgment described herein;

     c.   exemplary damages;

     d.  reasonable attorney fees under Chapter 38 of the Texas Civil Practice & Remedies Code, or Chapter 57.401(a) of the Texas Business & Commerce Code; and

     e.  such other and further relief, including pre-judgment and post-judgment interest, as this Court deems just and proper.

111.    Plaintiffs further request that the Court enter a temporary restraining order, temporary injunction, and permanent injunction prohibiting Defendants and any person acting on their behalf, including any persons Defendants' claim to have elected as managers or hired as employees, attorneys, or agents, of AlgEternal, from:

     a.  Infringing on the Patent by using any of AlgEternal's patented technology to grow algae or produce products from algae grown using AlgEternal's patented technology;

     b.  Acting on behalf AlgEternal or representing AlgEternal in any way;

     c.  Representing to any person that they have authority to act on behalf of or conduct business in the name of AlgEternal;

     d.  Representing to any person that the duly elected managers of AlgEternal, who are Milton Hugh Morris and Theodore McAlister, and no one else, do not have authority to act on behalf of AlgEternal.

     e.  Interfering in any way with the duly elected managers of AlgEternal, who are Milton Hugh Morris and Theodore McAlister, and no one else, from managing the affairs of AlgEternal;

f.  Exercising any dominion or control over any AlgEternal company property, including but not limited to AlgEtneral's company vehicles, equipment, money, bank accounts, website, or accounting software;

g.  Interfering with AlgEternal's access to any of its bank accounts or funds,

h.  Interfering with AlgEternal's access to its accounting software or any other company books or records;

i.  Making any false or defamatory statements to any person about any manager or member of AlgEternal; and

j.  Destroying any emails or documents that relate to AlgEternal.

Respectfully submitted,

**WARE, JACKSON, LEE, O'NEILL, SMITH & BARROW, LLP**

By: ___ /s/ Timothy R. Lankau _____
    Timothy R. Lankau
    State Bar No. 24046267
    timlankau@warejackson.com
    America Tower, 39th Floor
    2929 Allen Parkway
    Houston, Texas 77019
    Phone: (713) 659-6400
    Fax: (713) 659-6262

    **ATTORNEY FOR PLAINTIFFS**