| | | |
|---|---|---|
| ALGETERNAL TECHNOLOGIES, LLC, | § | |
| MILTON HUGHES MORRIS, AND KATON | § | |
| MORRIS | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| DAVID RAMJOHN, BRUCE DOPSLAUF, | § | CIVIL ACTION NO. 4:17-CV-02667 |
| BK COOK FAMILY, LP, | § | |
| BYRON COOK, ARTHUR DAY, M.D., | § | JURY DEMANDED |
| W.A. SANFORD, 5X5, SBS HOLDINGS, LP, | § | |
| HOCHBURG HOLDINGS, LP, | § | |
| DONALD MEINERS, | § | |
| ANNA KATHERINE SCHMIDT | § | |
| AND ROB EISSLER | § | |
| | § | |
| DEFENDANTS. | § | |

---

**PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION**

---

Plaintiffs AlgEternal Technologies, LLC, Katon Morris, and Milton Hugh Morris file this complaint against Defendants David Ramjohn, Bruce Dopslauf, BK Cook Family Limited Partnership, Byron Cook, Arthur Day, M.D., WA. Sanford 5x5 Trust, SBS Holdings, LP, Hochburg Holdings, L.P., Donald Meiners, Anna Katherine Schmidt, and Rob Eissler for patent infringement, declaratory judgment, breach of fiduciary duty, breach of contract, defamation, and other related causes of action.

**PARTIES**

1.      Plaintiff AlgEternal Technologies, LLC ("AlgEternal"), is a Texas Limited Liability Company with its principal place of business at 3241 Dubina-Weimar Road, Weimar, Texas 78962.

2.      Plaintiff Milton Hughes Morris is a Texas individual who resides at 3241 Dubina-Weimar Road, Weimar, Texas 78962.

3.      Plaintiff Katon Morris is an individual residing in El Paso County, Colorado.

4.      Defendant David Ramjohn is a foreign national who currently resides at 254 W. Milan Street, La Grange, Texas 78945.

5.      Defendant Bruce Dopslauf is a Texas individual who resides at 5133 Mullins Prairie Loop, La Grange, Texas 78945.

6.      Defendant BK Cook Family, LP is a Texas limited partnership with its principal place of business at 2200 Arcady Lane, Corsicana, Texas 75110.

7.      Defendant Byron Cook is a Texas individual who resides at 2200 Arcady Lane, Corsicana, Texas 75110

8.      Defendant Arthur Day, MD is a Texas individual who resides at 2226 Quenby Street, Houston, Texas 77005.

9.      Defendant W.A. Sandford 5X5 Trust is a Texas trust which can be served at 601 W. Main Street, Decatur, Texas 76234.

10.     Defendant SBS Holdings, LP, is a Texas limited partnership with its principal place of business at 601 W. Main Street, Decatur, Texas 76234.

11.     Defendant Hochburg Holdings, LP is a Florida limited partnership with its principal place of business at 317 Ocean Blvd. Golden Beach, Florida, 33160.

12.    Defendant Donald Meiners is a Texas individual that resides at 6326 Rocky Creek Road, La Grange, Texas 78945.

13.    Defendant Anna Katherine Schmidt is a Texas individual that resides at 352 E. Lower Line St. La Grange, Texas 78945.

14.    Defendant Rob Eissler is a Texas individual that resides at 431 Nursery Road, B-400, The Woodlands, TX 77380.

## II.

### NATURE OF ACTION

15.    This is a civil action for the willful infringement of United States Patent No. 9,534,197 B2 under 35 U.S.C. §1, *et. seq.*, for a declaratory judgment under 28 U.S.C. §2201 *et. seq.*, injunctive relief under Federal Rule of Civil Procedure 65, and various related Texas state law causes of action, including breach of contract, breach of fiduciary duty, defamation, and others.

## III.

### JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  It has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

17.    Defendants each have sufficient contacts with Texas generally and with the events underlying this claim, so that they are subject to the exercise of jurisdiction of this Court.

18.    Venue is proper in this Judicial District and Division because a substantial part of the events or omissions that gave rise to Plaintiffs' claims occurred in this Juridical District and Division.

## IV.

### THE PATENT

19.     On January 3, 2017 Patent Number 9,534,197 B2 was issued to Milton Hugh Morris (the "Patent").  Morris had previously assigned the pending patent to AlgEternal Technologies, LLC.  AlgEternal is the sole owner of the right to sue and to recover for any current or past infringement of the Patent.  A true and correct copy of the Patent is attached as Exhibit 1.

# V.

## CONDITIONS PRECEDENT

20.     All conditions precedent to the Plaintiffs bringing this suit are satisfied or have occurred.

# VI.

## FACTUAL BACKGROUND

### A.      Morris Founds AlgEternal, Technologies, LLC

21.     Milton Hugh Morris developed an apparatus and process for growing specialized strains or algae for use in cosmetic products and soil amendments.  He obtained the Patent for the apparatus and process.

22.     Morris and his associates founded AlgEternal, Technologies, LLC ("AlgEternal") on March 17, 2010 to monetize the Patent by using the technology to grow the specialized strains of algae and produce cosmetic products and soil amendments with the algae.[1]  The initial members and their membership interest percentages consisted of Morris with 51%, Old Plum Road investments, LP (a company controlled by Bruce Dopslauf) with 5%, BK Cook Family Limited Partnership, LP (a company controlled by Byron Cook) with 3%, Dr. Dan White with 5%, the

---

[1] Exhibit 2, AlgEternal Certificate of Formation; Exhibit 3 Initial Schedule of Ownership.

Paxton Family Living Trust (a trust controlled by Ken Paxton) with 1%, and Theodor McAlister with 5%.[2] The company retained other units in treasury.

23. McAlister physically formed the company by filing the certificate of formation with the Texas Secretary of State.[3] McAlister designated AlgEternal's two managers as himself and Morris.[4]

24. Morris assigned the Patent to AlgEternal as part of his initial contribution to the company. Morris also contributed all of the company's pre-formation development costs, which exceeded $200,000.

25. No one besides Morris had any scientific expertise in growing algae. The other members all either contributed financially or by assisting with the non-technical operation of the business. Morris was an experienced farmer and scientist and had started several successful small businesses. But Morris did not have any experience in managing a larger venture that took in funding from investors and he made this clear to his fellow initial members.

26. Therefore, the initial members agreed that Morris would handle the technical and scientific side of AlgEternal, and business side would be handled by McAlister and Rob Eissler, (AlgEternal's first CEO).

**B.    The Members Negotiate, but Never Execute, a Company Agreement**

27. AlgEternal was initially formed without a company agreement in place. After formation, Eissler and McAlister, with the help of others, began drafting and negotiating a potential company agreement.[5]

---

[2] Ex. 3.
[3] Ex. 2.
[4] *Id.*
[5] Exhibit 4, April 12, 2010 draft of company agreement with transmittal email; Exhibit 5, May 12, 2010 draft of company agreement with transmittal email; Exhibit 6, draft of company agreement of unknown date; Exhibit 7 draft company agreement proffered by Defendants of unknown date; Exhibit 8, draft of company agreement proffered by Plaintiffs.

28.      After a form agreement was proposed, Ken Paxton made redline changes, including changes to the expulsion provision in Section 15.4 of the agreement.[6]  Byron Cook insisted on a new Paragraph 20 to the agreement allowing him to withdraw as a member if Rob Eissler ever ceased to be the CEO as a precondition to his purchase of membership interests.[7]  It appears that the members that were involved in the company agreement negotiations agreed to the changes required by Cook and Paxton.

29.      It is not clear which members were shown which versions of the company agreement.  And it is not clear which members suggested important language in the proposed agreement.  It is likely that discovery in this case will shed more light on the process.  However, it is clear that there was significant confusion among the members about the status of the company agreement and ultimately, it does not appear that the vast majority of the members ever signed any version of the company agreement, much less the same version.[8]

30.      Many new members were admitted into AlgEternal over the next several years, and most of the new members were not required to sign, or even shown, a company agreement.[9]

31.      On June 5, 2017, David Ramjohn, the company's CEO sent an email to the members attaching an unsigned early draft of the company agreement and claimed this was AlgEternal's company agreement.[10]  Ramjohn acknowledged in his email that "I am uncertain as to whether or not every Member has received a copy of this and so in the interest of removing that uncertainty I am circulating the document to all Members."[11]

---

[6] Ex. 4.
[7] Ex. 8.
[8] Exhibit 9, Affidavit of Member Katon Morris; Exhibit 10, April 13, 2011 Email noting that a signed company agreement could not be located.
[9] *Id.*
[10] Exhibit 11, June 5, 2017 email with draft company agreement.
[11] *Id.*

32.     Morris recognized that this early draft was unsigned, missing pages, and lacked many of the changes that had previously been agreed to by various members. He investigated the issue and concluded that he was unsure whether all the Members had signed any one, final version of the company agreement. So he located what he believed to be the most recent version of the company agreement and had the company's two managers, himself and McAlister, sign that version as both members and managers, along with member Dan White.[12] He then circulated that version of the company agreement to the members.[13] In his email, Morris noted that he attached the most recent version of the agreement and stated that he would circulate this version to all the Members for their signature.[14] However, Ramjohn attempted to expel Morris, as discussed below, before Morris got that chance.

33.     Morris was under the impression that the members would voluntarily recognize the version he transmitted in July of 2017 as the most accurate and complete version of the agreement. Therefore, he attached that version to his Original Complaint as AlgEternal's company agreement. After Defendants filed their competing lawsuit offering a different version of the agreement, it became apparent that all the members were not in agreement regarding the company agreement. Morris investigated further and determined that the Members have not in fact agreed on a company agreement, prompting this Amended Complaint.

34.     In their competing lawsuit, Defendants have proffered another version of the company agreement that raises more questions than it answers:

> a.  Defendants' version is allegedly signed by four managers and no members. The "managers" listed on the signature block are Morris, White, Eissler, Cook, and Dopslauf. But White, Eissler, Cook, and Dopslauf were never elected as managers of the company. McAllister is missing as a manager from the block, and there is no dispute that he has always been a manager;

---

[12] Exhibit 12, July 22, 2017 email with draft company agreement.
[13] *Id.*
[14] *Id.*

b. The text of Defendants' version is the same text of an early draft circulated on May 12, 2010. It does not contain any of the changes to the company agreement that all parties agreed to in the early part of 2010, such as Paragraph 20 and the clarification in Paragraph 15.6;

c. The "created on" date on the PDF document Defendants attached is July 6, 2011. But signatures on the document are dated March 3, 2010, May 5, 2010, and April 13, 2010. It does not appear that there were any drafts of the company agreement prior to May 12, 2010;

d. The signature pages Defendants attach came from a different source of the text of the alleged agreement. The text of Defendants' exhibit ends on page 42, then several copies of page 43 are included, which contain a signature blocks for "Managers." The signature block is clearly from a different source as the rest of the agreement because it has been scanned from a binder. The punch holes are visible on the signature pages, but not on the rest of the document;

e. Defendants' version is the same version that Ramjohn attached to his June 5, 2017 email where he admitted he was "uncertain" whether all the members had received a copy of the agreement, which would preclude all the members signing or agreeing to the agreement;

f. Defendants' alleged agreement is missing pages 43-47. These pages originally included a signature block for the members of the company; and

g. No defense witness has, to date, testified that Defendants' purported company agreement is AlgEternal's company agreement. Defendants include affidavits from Ramjohn and Dopslauf in their filing, but neither witness testified that their version of the company agreement was the correct version of the agreement or that any person had orally agreed to their version. In contrast, Morris has testified in this Verified Amended Complaint that the version he attached is, to his understanding, the most current and accurate version of the agreement.[15]

35. Plaintiffs' best guess about Defendants' signature page is that someone circulated that page at some point, but did not attach it to any version of the company agreement. To the extent Morris signed the signature page (which he has no specific recollection of doing), he did so assuming it would be attached to the latest agreed version of the company agreement and failed to realize that the signature block was for "managers" but did not include the actual members of the company.

---

[15] Ex. 7.

36.     It is therefore clear that the members of AlgEternal have never agreed to a company agreement.  As such, AlgEternal remains subject to the default rules governing Limited Liability Company's contained in the Texas Business Organizations Code ("TBOC").

## C.     AlgEternal Only Has Two Properly Elected Managers

37.     Section 101.302 of the TBOC sets the initial managers as those managers listed on the company's certificate of formation.  Morris and McAlister are the only two managers listed on AlgEternal's certificate of formation.[16]

38.     Section 101.302 of the TBOC only allows a company to increase its number of managers by adopting a company agreement that allows the company to do so.  Because AlgEternal has not adopted a company agreement, it can only have two managers.

39.     Section 101.306 of the TBOC permits the members to remove and elect new managers at a properly noticed, in person meeting of the members by a majority vote of members. AlgEternal has never had a property noticed, in person meeting of members to remove or elect any new managers.[17]

40.     In the alternative, if the Court finds that AlgEternal somehow adopted a company agreement, all the alleged drafts of the AlgEternal's company agreement allow the managers, and only the managers, to appoint new managers by a majority vote of managers.[18]  But they must do so at a formal meeting of managers or by a formal, written resolution.[19]

41.     No meeting of managers has ever been convened and no written resolution has been drafted or signed to appoint additional managers, and the company's certificate of formation has never been changed to reflect the appointment of additional managers.[20]

---

[16]     Ex. 2.
[17]     Exhibit 13, Affidavit of McAlister.
[18]     *Id.*
[19]     *Id.*
[20]     *Id.*; Ex. 2; Exhibit 14, Affidavit of Dr. Dan White.

42.     The members and managers' confusion regarding state law and the draft company agreement created uncertainty about the managers of AlgEternal. Morris and McAlister considered appointing or electing White, Dopslauf, Eissler, and Cook as additional managers at various points in time. But they ultimately decided not to formally do so because those persons demonstrated a lack of interest in being heavily involved in AlgEternal's management. A few company documents contain signature blocks that list White, Dopslauf, Eissler, Cook as additional managers.[21] But there are many other documents that list only Morris and McAlister as managers.[22] And all the documents are inconsistent, listing different groups of people as managers at different points in time.[23] Indeed, on April 30, 2013, Bryon Cook wrote a letter to the members noting that he members needed to address the "[e]lection of managers in accordance with our Member Agreement."[24]

43.     Therefore, under either the TBOC or the draft company agreements, AlgEternal's only two property elected managers are Morris and McAlister.

**D.     AlgEternal Grows and Shows Promise**

44.     Morris used AlgEternal's startup funds to build several large-scale reactors to grow different strains of algae. AlgEternal built specialized buildings to house the reactors, as well as a lab and office space at two locations.[25]

45.     Evaluations by Texas A&M University proved the viability of its soil amendment products.[26] The company lined up hundreds of thousands of dollars in orders for its cosmetic

---

[21]     Ex. 2; Ex. 14; Exhibit 15, Documents inconsistently listing various persons as managers of AlgEternal.
[22]     *Id.*
[23]     *Id.*
[24]     Exhibit 16, April 30, 2013 Email and Letter.
[25]     Exhibit 17, Photographs of AlgEternal facilities; Exhibit 18 AlgEternal investor presentations and updates.
[26]     Exhibit 19, Texas A&M Study.

products, which sell for $80 per oz. that are made from sulfated polysaccharide valued at $300 per gram.

46.     AlgEternal has thus far succeeded where many other companies have failed by growing certain strains of algae on a commercial scale in a manner that is potentially economically viable.[27]  Much larger companies with tens of millions in funding have not been able to match those results.

**E.      AlgEternal Hires David Ramjohn as a Consultant**

47.     Eissler resigned as CEO June 21, 2012.[28]  Morris took over as CEO between 2012 and 2015.

48.     In late 2015, Morris began suffering from serious health issues leading to congestive heart failure.  Fearing for the business, he decided to hire a new CEO to take over some of the company's management.

49.     Morris met David Ramjohn at an industry event.  Mr. Ramjohn was a citizen of Trinidad and Tobago who claimed to have experience in the algae industry.  Ramjohn boasted an impressive resume, but in reality, he had been a disaster in the private sector.

50.     Based on a litany of fraudulent misrepresentations by Ramjohn, Morris recommended to the managers and members that the company hire Ramjohn as a CEO.  Ramjohn has never been given any ownership in the company or been appointed as a manager.

51.     Morris later discovered that the company could not hire Ramjohn as a CEO due to US immigration law, and Ramjohn instead agreed to be formally hired as a paid consultant.[29]

**F.      Ramjohn Abuses his Authority**

---

[27]     Exhibit 20, AlgEternal State of the Company Report.
[28]     Ex. 21, Rob Eissler's resignation letter.
[29]     Exhibit 22, David Ramjohn's Consultancy Agreement.

52.     The managers' relationship with Ramjohn quickly soured.  Ramjohn had held himself out as a CEO knowledgeable in proper corporate management and stewardship.  Based on his credentials, the managers believed him.

53.     Ramjohn presented the managers with a consultancy agreement that he claimed was standard and appropriate.  But the agreement was not standard nor appropriate.  It contained a clause that obligated the company to pay all Ramjohn and his families' personal living expenses, including housing and "wardrobe" expenses, which is highly unusual in a corporate setting.[30]  The managers did not appreciate that Ramjohn would take advantage of the company in the way he did, and signed the agreement on the assumption that Ramjohn would behave in a professional manner.

54.     Ramjohn did not behave in a professional manner.  As soon as he got access to company accounts he began charging the company for a host of personal expenses, including expensive clothing, lodging expenses, and unauthorized travel.  All of these charges were in addition to his $10,000 a month salary, which was extremely high for an employee of a small start-up company in Fayette County that had not yet begun generating revenue.

55.     At the time Ramjohn was making these charges, the company was in dire financial straits.  Whether or not the charges were contractually allowed by Ramjohn's agreement with the company (and they probably were not due to their general unreasonableness) they were a breach of Mr. Ramjohn's fiduciary duties to the company given their overall unreasonableness and the company's precarious financial situation.

---

[30]     *Id.*

56.     On information and belief, Ramjohn also appears to have engaged in some outright embezzlement. He appears to have misdirected at least one company check to his personal accounts.

57.     Ramjohn was also a disaster on the business side. He did not bring in any of the investment dollars he promised. He did not develop any new business. He was no help with the scientific or technical aspects of the company. He created unreasonable budgets that attempted to shift money away from the actual operations of the company (growing algae) in favor of useless administrative and corporate overhead, and could not stay within his own budgets.

58.     Because of these issues, Morris and McAlister moved to demote Ramjohn while they investigated his actions. The managers informed Ramjohn that if he did not accept his demotion, he would be terminated. Ramjohn did not accept his demotion and was terminated.[31]

## G.     Ramjohn Attempts to Steal the Company

59.     Unbeknownst to Morris, as soon as Ramjohn was hired, he began working behind the managers' and majority owners' backs to attempt a hostile takeover of the company and to steal the Patent.

60.     Ramjohn began contacting the members and spreading wild and defamatory lies about Morris. Ramjohn told the members that Morris was embezzling money from the company and selling company products and keeping the money from the sales.

61.     These allegations were demonstrably false. Morris has records that show the only person embezzling money was Ramjohn. And the company was not even producing the product Ramjohn claims Morris sold for personal profit at the time Ramjohn claimed it was sold.

---

[31] Exhibit 23, David Ramjohn's Termination Resolution.

62.     Nevertheless, through his lies, Ramjohn managed to convince a minority group of investors that owned approximately 37% of the company that Morris was a bad actor (this minatory group is hereafter referred to as the "Signing Minority Members," and most of these members are Defendants in this lawsuit).

63.     Ramjohn then had the Signing Minority Members sign a bizarre "resolution" that stated that Morris had committed, among other things "fraud," "theft," and "gross negligence" and had "willfully" violated the company agreement.[32]

64.     The resolution then claimed that because the Signing Minority Members constituted a "Super Majority" of members (they did not) they had the power to, and did, cause the forfeiture of all Morris' membership interest and the removal of Morris as a manager of the company.[33]  The resolution then went on to "elect" five new managers of the company.[34]

65.     This "resolution" was wrong on so many levels that is difficult to imagine how any rational person could think it was effective or complied with the company agreement.  First, Ramjohn based the resolution on the authority of a draft company agreement that AlgEternal's members never adopted, as discussed above.  And the TBOC has no default provision that would allow for the removal of a member.  The TBOC only allows managers to be removed and elected by a majority vote of members at a properly noticed, in person meeting, which has not happened.

66.     In the alternative, even if any of the draft company agreements had been adopted by AlgEternal, the draft company agreements only allow a "Super Majority' of the members to remove a fellow member from the company.[35]  The company agreement defines "Super Majority" as "one or more members having among them more than 80% of the Percentage Interests of all

---

[32]     Exhibit 24, Fraudulent "Resolution" and Cover Letter to Morris.
[33]     *Id.*
[34]     *Id.*
[35]     Ex. 8 at ¶1.01.

Members."[36]  The resolution claims that Signing Minority Members constitute a "Super Majority" of members, but they only own among them approximately 37% of the "Percentage Interest of all Members."[37]

67.     The "resolution" also claims to remove Morris and McAlister as managers and "elect" five new managers.[38]  But it is only signed by the Signing Minority Members, and not by either of the company's two managers—Morris and McAlister.[39]  And the draft company agreements only give the company's managers, not the company's members, the authority to remove managers or appoint or elect new managers.[40]

68.     Finally, the "resolution" parrots boilerplate language from the draft company agreements and states Morris has committed "fraud," "theft," and "gross negligence" but contains

---

[36]     *Id.*

[37]     Exhibit 25, AlgEternal Current Schedule of Ownership and Unit Certificates.  Although it is difficult to imagine exactly what the Signing Minority Members are thinking, they may be trying to ignore the definition of "Super Majority" in the company agreement and craft a theory that because the expulsion provision, after it references the defined term, includes a parenthetical that states (not including the member to be expelled), "Super Majority" should somehow be calculated without including Morris' 42% Percentage Interest.  This would be wrong, because the company agreement clearly defines "Super Majority" as 80% of "all" members' Percentage Interests, not any subset of those members.  But it doesn't matter.  Even if Morris' interests are removed from the equation, the Signing Minority would only constitute approximately 41.5 out of 68.5 remaining units, far short of 80%.  The only other conceivable theory would be that Morris "pledged" 20 of his membership interests back to the company at a meeting in on May 31, 2017.  But this pledge was subsequently unanimously rejected by the managers of the company and rescinded by Morris.  And even if the pledge was effective, the 26 units held by the signing minority members would still only constitute 41.5 of 68.5 outstanding units, because these 20 units would not have disappeared, they would just be held in the company treasury, and the company, which acts through its managers, has not voted to exclude Morris.  And finally, even if those 20 units could somehow be deemed to have disappeared, the minority members would still only represent 26 out of 58 remaining units.  Put simply, there is no calculation, no matter how creative, that gives the Signing minority members the 80% required by the company agreement.

   Defendants have also raised a question about what percentage interest Morris owns.  Attached as Exhibit 26 is a group of documents evidencing Morris' ownership percentages over time.  Morris initially owned 51% of the company (there are also some inaccurate schedules of ownership showing Morris owning 59.824%).  Over the years, he transferred some of his interests to Dopslauf and Cook, and another member leaving him with 41.55%.  Documents evidencing the transfers are attached as Exhibit 27.

[38]     Ex. 24.

[39]     *Id.*  To the extent Defendants argue that Dopslauf, Eissler, and White were appointed managers, this would not change anything.  The company agreement only authorized the managers to act by majority vote.  Morris, McAlister, and White who would be the majority of managers if Dopslauf, White and Eissler had been appointed, did not sign or vote on any resolution to elect new managers.

[40]     Ex. 7 at ¶15.4.

no specific findings of any wrongdoing, and attaches no evidence.[41] And actual findings of wrongdoing are a prerequisite to expulsion under the draft company agreements.[42]

69.     Indeed, the only real evidence Ramjohn attached to Defendants' competing lawsuit was his own very misleading affidavit.  For example, Ramjohn claims in the affidavit that Morris borrowed money and repaid the debt by issuing stock certificates from the company, creating the impression that Morris transferred company property to repay personal debts.  In reality, Morris sold approximately 9.5% of his *own* interest in the company to Dopslauf and Hochberg and another member in a series transparent, arm's-length transactions carefully documented by Dopslauf and Hochberg's lawyers.[43]  Ramjohn's affidavit also claims that Morris wrote himself and his other company "checks" totaling over $600,000 to give the impression that Morris embezzled money. But the affidavit fails to mention that most of those checks were Morris's salary for over seven years as the COO of the company—a salary that was significantly lower than Ramjohn's.  And the remaining checks were for legitimate expense reimbursements, which can easily be established once Defendants stop preventing Morris from accessing the company's financial records.

70.     The fraudulent "resolution" was therefore void *ab initio*.

71.     When each of the Signing Minority Members signed the resolution, they knew that the resolution would be circulated to all the members.

72.     They also knew that the resolution would be circulated in the business community in which Morris had worked for over a decade to establish a sterling reputation, as well as the company's customers, suppliers and business partners.

73.     They also knew that the resolution, and its transmittal letter, contained statements that were highly defamatory of Morris, including statements that Morris had committed fraud,

---

[41]     Ex. 24.
[42]     Ex. 7 at ¶15.4.
[43]     Exhibit 26, Unit Sale Documentation.

theft, and gross negligence. These statements accused Morris of criminal wrongdoing as well as an inability to perform his business and dishonesty in business.

74.     Ramjohn and the Signing Minority Members then took the fraudulent resolution and used it in a campaign to infringe upon the Patent, smear Morris, and an attempt to take control of the company.

75.     They used the resolution to seize the company's bank accounts, which was only possible because one of the Signing Minority Members, Dopslauf, was the chairman of the company's bank.

76.     They also used their password access to lock Morris out of the company's accounting software, and they circulated the resolution to the company's customers and suppliers in an attempt to convince them that they, not Morris, were authorized to act on behalf of the company.

77.     They even attempted to send men to seize company property from Morris.

78.     Defendants have also used the fraudulent resolution to infringe on the Patent.

79.     Defendants have in their possession one of AlgEternal's algae growing apparatuses. They have made their position clear that they believe they control AlgEternal and the Patent and are actively attempting to use the apparatus to grow algae, produce products with the algae, and sell the products under the name of AlgEternal.

80.     These actions have caused immeasurable harm to the company at a time when the company is in a fragile state. For example, the company is on the verge of fulfilling its first order for cosmetic cream, which could net the company upwards of $300,000. But the seizure of the company's bank accounts is preventing the company from fulfilling the order, and will likely cause the company to lose its most valuable customer. The immediate near-term harm of Defendants' actions, without a doubt, already exceeds five million dollars in near-term lost revenue.

81.     The actions have put the company's bright future in serious peril.  Ramjohn, with approval of many of the Signing Minority Members, had previously valued the company's future revenues at tens of millions of dollars.

82.     Defendants actions have put all of those revenues at risk, and should the company fail, Plaintiffs will seek damages based on the company's expected future performance.

## VII.

### APPLICATION FOR PRELIMINARY AND PERMEANT INJUNCTION

83.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

84.     As detailed above, Defendants are unlawfully seeking conduct business on behalf of AlgEternal, infringing the Patent, and are interfering with AlgEternal's managers' rights and duties to manage the company.  Defendants interference includes, but is not limited to, infringing on the Patent, representing to the company's customers, suppliers, bankers, employees, members, and other business partners that they are the duly elected managers of the company and that the actual managers of the company have no authority to act on behalf of the company.  Defendants have prevented the company's managers from accessing company funds and the company's books and records.  Defendants are currently attempting to seize company property to which they have no possessory right.

85.     A preliminary injunction is appropriate where the party seeking the injunction shows that it is likely to succeed on the merits, it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in its favor, and that an injunction is in the public interest.  A permeant injunction is appropriate where the party seeking the injunction as suffered irreparable harm that cannot be adequately compensated by money damages, the balance of equities tips in favor of an injunction, and the public interest favors an injunction.

86.     Plaintiffs will probable succeed on the merits because, among other reasons, Both the TBOC and the draft company agreements and related documentation are clear regarding who the managers and members of the company are, and what actions and votes are required to change the management or membership of the company.  Defendants "resolution" does not comply with the TBOC or the draft company agreements, as detailed above and this thus void *ab initio*.

87.     Plaintiffs have suffered and will continue to suffer irreparable harm absent an injunction because Defendants Patent infringement and illegal interference with their ability to manage AlgEternal will harm the company in such a wide-ranging manner that it will create damages that will be difficult to calculate as well as enormous.  None of the Defendants will be able to satisfy a money judgment that adequately compensates AlgEternal or its members for the harm that will be created if Defendants are permitted to destroy the company with their illegal hostile takeover attempt.  Further, AlgEternal's intellectual property is unique, and Defendants are willfully infringing on Morris's assigned patents by taking control of AlgEternal's patented technology.

88.     The balance of equities strongly favors an injunction.  On the one hand, Defendants' actions, described above, will destroy the company if they are allowed to continue.  On the other hand, there will be no harm to Defendants if they are ordered to comply with the TBOC or, in the alternative, the draft company agreement, and stop interfering with the proper management of the company.  As members in the company, Defendants only stand to benefit from the company's survival and success.

89.     The public interest will be served by an injunction, or at least an injunction is not against the public interest.  Defendants are seeking to seize private property from Morris with no Court involvement, and public policy encourages the orderly and peaceful resolution of disputes in court.

90.     Plaintiffs therefore request that the Court enter a preliminary and permanent injunction under Federal Rule of Civil Procedure 65 prohibiting all Defendants and any person acting on their behalf, including any persons Defendants' claim to have elected as managers or hired as employees, attorneys, or agents, of AlgEternal, from:

a. Infringing on the Patent by using any of AlgEternal's patented technology to grow algae or produce products from algae grown using AlgEternal's patented technology;

b. Acting on behalf AlgEternal or representing AlgEternal in any way;

c. Representing to any person that they have authority to act on behalf of or conduct business in the name of AlgEternal;

d. Representing to any person that the duly elected managers of AlgEternal, who are Hugh Morris and Theodore McAlister, and no one else, do not have authority to act on behalf of AlgEternal.

e. Interfering in any way with the duly elected managers of AlgEternal, who are Hugh Morris and Theodore McAlister, and no one else, from managing the affairs of AlgEternal;

f. Exercising any dominion or control over any AlgEternal company property, including but not limited to AlgEternal's company vehicles, equipment, money, bank accounts, website, or accounting software;

g. Interfering with AlgEternal's access to any of its bank accounts or funds,

h. Interfering with AlgEternal's access to its accounting software or any other company books or records;

i. Making any false or defamatory statements to any person about any manager or member of AlgEternal; and

j.   Destroying any emails or documents that relate to AlgEternal.

91.   Plaintiffs are willing to post a bond for the preliminary injunction requested herein.

## VIII.

### CAUSES OF ACTION

### A.

### INFRINGEMENT OF THE PATENT

92.   Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

93.   As detailed above, Defendants have infringed upon the Patent literally and/or under the doctrine of equivalents, by using AlgEternal's patented technology to grow specialized strains of algae and make products from that algae for sale and/or offering to third parties to do so without authority and in violation of 35 U.S.C. § 271(a), (b), and (c).

94.   Defendants do not have any license or authority from AlgEternal or any other person to use the Patent.

95.   The notice provisions of 35 U.S.C. § 287(a) do not apply because AlgEternal has not sold or offered to sell its patented technology to the general public.  To the extent Section 287 does apply, Defendants have been given effective written notice that their actions violate the patents in the form of communications from the duly elected management of AlgEternal that their actions violate the Patent and Defendants continue to willfully violate the Patent.

96.   Upon information and belief, Defendants continue to willfully infringe on the Patent.  Defendants' willful infringement of the Patent renders this an exceptional case pursuant to 35 U.S.C. § 285.

97.   Because of Defendants' infringement of the Patent, Plaintiffs have suffered damages and will continue to suffer damages in the future.

**B.**

DECLARATORY JUDGMENT

98.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

99.     As described above, Plaintiffs and Defendants have an actual controversy regarding who has the authority to act on behalf of AlgEternal and use the Patent.  Plaintiffs thus request a declaratory judgment pursuant to 28 U.S.C. § 2201 that:

     a.  The proper duly elected managers of AlgEternal are Milton Hugh Morris and Theodor McAlister, and no one else;

     b.  Defendants do not have the authority to act on behalf of AlgEternal or use the Patent; and

     c.  The August 15, 2017 purported resolution signed by Defendants attempting to expel Milton Hugh Morris as a Member of AlgEternal and elect new managers of AlgEternal does not comply with the TBOC, or, in the alternative, the draft AlgEternal company agreement, and has no force or effect.

**C.**

VIOLATION OF THE **TBOC**

100.    Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

101.    Because AlgEternal does not have a company agreement, it is governed by the default provisions in the TBOC.

102.    Sections 101.251-307 of the TBOC state that only the company's managers have authority to manage the affairs of the company.

103.    Each Defendant violated the TBOC by the actions described above, including, but not limited to, interfering with AlgEternal's managers management of the company, and by signing a resolution that violated the TBOC in numerous ways.

22

104. Defendants' actions damaged Plaintiffs by harming the company in wide-ranging ways, as described above, including the loss of near term revenue, productivity, and future business.

105. Plaintiffs seek their actual damages as well as their attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## D.

### In the Alternative, Breach of Contract

106. Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

107. As detailed above, it does not appear that the members of AlgEternal ever agreed to a company agreement.

108. To the extent that either party establishes that any of the draft agreements for AlgEternal were agreed to by the members, Defendants breached those draft agreements by all of the actions described above, including, but not limited to, breaching the draft agreements by interfering with AlgEternal's managers management of the company, and by signing a resolution that violated the draft company agreements in numerous ways.

109. Defendants' actions damaged Plaintiffs by harming the company in wide-ranging ways, as described above, including the loss of near term revenue, productivity, and future business.

110. Plaintiffs seek their actual damages as well as their attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

## E.

### BREACH OF FIDUCIARY DUTY

111. Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

112.     Ramjohn owed AlgEternal and its members fiduciary duties as an officer of the company.  Those fiduciary duties included the duties of loyalty, honesty, good faith, care, and disclosure.  Ramjohn violated those duties by all of the actions described above, including but not limited to putting his own interests ahead of the company, committing all the acts of dishonesty described above, charging the company for unreasonable and improper personal expenses, embezzling money, negligently discharging his duties and an officer, participating in the improper hostile takeover attempt, interfering with the company's duly elected management, intentionally harming the company's relationship with its customers, suppliers, and business partners, and defaming Morris, the company, and its members.

113.     All Defendants owned the AlgEternal and its members fiduciary duties to the extent they exercised control over the company.  All Defendants have exercised control over the company by participating in their fraudulent hostile takeover attempt which included seizing the company's bank accounts and assets.  Further, to the extent Dopslauf and Eissler were ever properly appointed as managers (which they were not), they owed fiduciary duties as managers.  Eissler also owed fiduciary duties as an officer of the company.  Defendants violated their duties by all of the actions described above, including but not limited to participating in the fraudulent takeover attempt, putting their interests ahead of the company's and the other members, interfering with the company's duly elected management, intentionally harming the company's relationship with its customers, suppliers, and business partners, and defaming Morris, the company, and its members.

114.     Defendants' actions damaged Plaintiffs by inflicting wide-ranging harm on AlgEternal, as detailed above.

115.     Plaintiffs' seek actual and punitive damages for Defendants' breaches of their fiduciary duties.

116.    Upon a finding that Defendants breached their fiduciary duties, Plaintiffs seek the equitable remedy of disgorgement.

## F.

### DEFAMATION, LIBEL, SLANDER, DEFAMATION *PER SE*, LIBEL *PER SE*, SLANDER *PER SE*, AND BUSINESS DISPARAGEMENT

117.    Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

118.    All Defendants committed defamation, libel, slander, and business disparagement by the numerous acts described above, including but not limited to creating a document that stated that Morris committed fraud, theft, gross negligence and other bad acts and publishing that document to numerous people in the community including people that Morris did business with on a regular basis.  Various Defendants such as Ramjohn and Dopslauf also made numerous oral statements to members of the company and members of the community that Morris committed fraud, theft, gross negligence and other bad acts.  All of these statements constituted defamation, libel, and slander *per se* because they accused Morris of committing crimes, stated that Morris was unable to conduct his business, and accused Morris of dishonesty in his business dealings.

119.    These statements harmed Morris by seriously damaging his reputation in the general and business community.

120.    Morris seeks punitive as well as compensatory damages for his defamation related causes of action.

## G.

### CONSPIRACY

121.    Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

122.     All Defendants conspired with one and other, as detailed above, to engage in the fraudulent hostile takeover scheme that infringed on the Patent, breached various Defendants' fiduciary duties, and constituted defamation, theft, and conversion.  Each Defendant, as detailed above, committed unlawful, overt acts to advance the conspiracy, including signing the fraudulent "resolution," improperly exercising control over company assets, and making defamatory statements about the company's managers.

123.     Plaintiffs were damaged by Defendants' conspiracy because it caused wide ranging damages to the company, as detailed above.

124.     Plaintiffs seek actual and punitive damages for their conspiracy cause of action.

## H.

### THEFT LIABILITY ACT

125.     Defendants are liable to Plaintiffs under the Texas Theft Liability Act, Civ. Prac. & Rem. Code § 134.001, et. Seq.

126.     Defendants have unlawfully exercised dominion and control over property belonging to the company, including the theft and embezzlement of company funds, as described above, and the seizure of company bank accounts and property.

127.     As a result, Plaintiffs have suffered injury by being deprived of the use and value of their personal property.

128.     Plaintiffs seek the return of their property, plus actual damages for loss of use, including lost profits, and additional damages and attorneys' fees as permitted under Section 134.005 of the Civil Practice and Remedies Code.

## I.

### CONVERSION

129.     Plaintiffs incorporate the preceding paragraphs of this petition as if set forth in full.

130.     Defendants have unlawfully exercised dominion and control over property belonging to the company, including the theft and embezzlement of company funds, as described above, and the seizure of company bank accounts and other property.

131.     As a result, Plaintiffs have suffered injury by being deprived of the use and value of their personal property.

132.     Plaintiffs seek actual and punitive damages of Defendants' conversion.

## IX.

### DEMAND FOR JURY TRIAL

133.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all issues triable by jury,

## X.

### PRAYER

134.     WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendants be cited to appear and answer, and that Plaintiffs be awarded a judgment against Defendants for the following:

    a.   actual damages plus interest;

    b.   the declaratory judgment described herein;

    c.    exemplary damages;

    d.   reasonable attorney fees under Chapter 38 of the Texas Civil Practice & Remedies Code, or Chapter 57.401(a) of the Texas Business & Commerce Code; and

    e.   such other and further relief, including pre-judgment and post-judgment interest, as this Court deems just and proper.

135.     Plaintiffs further request that the Court enter a preliminary and permanent injunction prohibiting Defendants and any person acting on their behalf, including any persons

Defendants' claim to have elected as managers or hired as employees, attorneys, or agents, of AlgEternal, from:

a. Infringing on the Patent by using any of AlgEternal's patented technology to grow algae or produce products from algae grown using AlgEternal's patented technology;

b. Acting on behalf AlgEternal or representing AlgEternal in any way;

c. Representing to any person that they have authority to act on behalf of or conduct business in the name of AlgEternal;

d. Representing to any person that the duly elected managers of AlgEternal, who are Milton Hugh Morris and Theodore McAlister, and no one else, do not have authority to act on behalf of AlgEternal.

e. Interfering in any way with the duly elected managers of AlgEternal, who are Milton Hugh Morris and Theodore McAlister, and no one else, from managing the affairs of AlgEternal;

f. Exercising any dominion or control over any AlgEternal company property, including but not limited to AlgEternal's company vehicles, equipment, money, bank accounts, website, or accounting software;

g. Interfering with AlgEternal's access to any of its bank accounts or funds,

h. Interfering with AlgEternal's access to its accounting software or any other company books or records;

i. Making any false or defamatory statements to any person about any manager or member of AlgEternal; and

j. Destroying any emails or documents that relate to AlgEternal.

Respectfully submitted,

**WARE, JACKSON, LEE, O'NEILL,
SMITH & BARROW, LLP**

By: ___/s/ Timothy R. Lankau_____

    Timothy R. Lankau
    Texas Bar No. 24046267
    Federal I.D. No. 660008
    timlankau@warejackson.com
    America Tower, 39th Floor
    2929 Allen Parkway
    Houston, Texas 77019
    Phone: (713) 659-6400
    Fax: (713) 659-6262

    **ATTORNEY-IN-CHARGE FOR PLAINTIFFS,
    ALGETERNAL TECHNOLOGIES, LLC
    MILTON HUGH MORRIS & KATON MORRIS**

**OF COUNSEL:**
John E. Nelson
Texas Bar No. 14900300
Federal I.D. No. 4216
jaynelson@warejackson.com
America Tower, 39th Floor
2929 Allen Parkway
Houston, Texas 77019
Phone: (713) 659-6400
Fax: (713) 659-6262

**ATTORNEY FOR PLAINTIFFS,
ALGETERNAL TECHNOLOGIES, LLC
MILTON HUGH MORRIS & KATON MORRIS**

## VERIFICATION OF MILTON HUGH MORRIS

STATE OF TEXAS      §
                      §

COUNTY OF FAYETTE    §

      Before me, the undersigned Notary Public, on this day personally appeared **Milton Hugh Morris** who being by me duly sworn upon his oath deposed and said he is a Manager of AlgEternal Technologies, LLC ("AlgEternal"), and that, upon personal knowledge, he states that AlgEternal and Morris in his personal capacity has verified that the statements of fact made in Plaintiffs' First Amended Verified Complaint and Application for Preliminary and Permanent Injunctive Relief are true and correct based upon his personal knowledge and the information available to the company. Further, he states that he is a custodian of records for AlgEternal. The documents referred to as **Exhibits 1-25** Plaintiffs' First Amended Verified Complaint and Application for Preliminary and Permanent Injunctive Relief are pages of records from AlgEternal. These pages of records are kept by AlgEternal in the regular course of its business, and it was the regular course of business of AlgEternal for an employee or representative with knowledge of the act, event, condition, opinion or diagnosis recorded to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter. The records referenced above are the original or exact duplicate of the original.

_____

Milton Hugh Morris

      SUBSCRIBED and sworn to before me on the ___5th___ day of October 2017, to certify which witness my hand and seal.

_____

Notary Public in and for the State of Texas

KRISTY JANAK
_____

Printed Name of Notary

My Commission Expires:
APRIL 8, 2019

KRISTY JANAK
Notary Public
STATE OF TEXAS
My Comm. Exp. April 8, 2018